VISION, INC., Plaintiff,

v.

Alexis PARKS, d/b/a Alexis Parks Communications and Alexis Parks Communications, Inc., Defendants.

No. 85 Civ. 3022 (RWS).

United States District Court, S.D. New York.

June 6, 1985.

Balogh, Osann, Kramer, Dvorak, Genova and Traub, New York City, for plaintiff; Harold Traub, Andrew D. Maslow, New York City, of counsel.

Albert Robin, New York City, for defendants; Howard B. Barnaby, New York City, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Vision, Inc. ("Vision Inc") brought this action charging defendants Alexis Parks ("Parks") and Alexis Parks Communications, Inc. with trademark and trade name infringement, violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), unfair competition, injury to business reputation under N.Y.Gen. Bus.Law § 368–a, and deceptive acts and practices under N.Y.Gen.Bus.Law § 349. Vision now seeks a preliminary injunction enjoining the defendants from using the designation VISION or VISION USA on and in connection with the sale and publishing of a magazine. For the following reasons, Vision's motion is denied.

**Facts**

Vision Inc., a New York corporation with its principal place of business in New York, has been publishing a Spanish language magazine called VISION since November 1950. Since September 1952 Vision Inc. has also published a newsletter called THE VISION LETTER. Both publications deal with news and articles pertaining to Latin America. Although Vision Inc. registered both marks in the United States Patent and Trademark Office, the registration of VISION for a Spanish language magazine was not renewed on the due date, May 15, 1982, and has expired. A new application was filed on January 11, 1985. Vision Inc. is the registrant and owner of a valid trademark for "THE VISION LETTER."

Alexis Parks is an individual operating under the trade name Alexis Parks Communications and controlling Alexis Parks Communications, a New York corporation with its principal place of business in New

York (collectively "Parks"). In 1983 Parks developed a free-standing newspaper insert which is intended to present new ideas emerging in health, the workplace and lifestyles. According to Parks, the mark VISION USA was selected for the publication, which is distributed exclusively as a supplement to newspapers, after a trademark search revealed that Vision Inc.'s registration of VISION had expired, that the registration of THE VISION LETTER covered a mark and goods different from Parks, and that there were a number of other registrations of marks containing the word "VISION" for various types of publications. Parks' application to register the mark VISION USA was accepted by the United States Patent and Trademark Office and was published for opposition on May 14, 1985.

Parks published the premiere issue of VISION USA in November, 1984. Parks subsequently received a letter dated December 10, 1984 from Vision Inc.'s attorneys requesting that she discontinue use of the mark VISION. In response to the letter, Parks met with Richard Rapold ("Rapold"), publisher of VISION Magazine, on December 11, 1984. According to Parks, some manner of agreement was reached at the meeting, and Parks' attorneys advised Vision Inc. of the alleged accommodation by letter dated December 17, 1984. By letter dated December 19, 1984, Rapold denied the existence of any agreement.

Apparently there was no further communication between the parties, and Parks continued to develop the VISION USA publication. Parks now has commitments from newspapers in ten geographic areas for inclusion of the magazine-type insert as a monthly Sunday supplement. The next issue is scheduled to be published in September 1985.

According to Vision Inc., at least one incident of confusion between VISION and VISION USA has occurred since the first publication of VISION USA. It asserts that the vice president of New York advertising agency suggested to a client that he call VISION INC., but apparently supplied the number of VISION USA instead, causing the client considerable confusion.

Vision Inc. subsequently filed suit charging Parks with trademark infringement, unfair competition and deceptive business practices. Contending that the use of the mark VISION USA has created and is likely to create confusion among the purchasing public and in particular the advertising community, Vision Inc. also moved to enjoin the continued use of the mark by Parks.

**Discussion**

■ Under the well-settled law of the Second Circuit, to succeed on a motion for a preliminary injunction in a trademark infringement action the moving party has the burden of establishing: (a) irreparable harm; and (b) either (1) probable success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary injunctive relief. *See Kaplan v. Board of Education,* 759 F.2d 256 (2d Cir.1985); *Sperry Int. Trade, Inc. v. Gov't of Israel,* 670 F.2d 8, 11 (2d Cir.1982).

■ Once the threshold issue of a mark's eligibility for protection is resolved, the central question in a trademark case is "whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978); *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). A showing of a likelihood of confusion establishes both the requisite likelihood of success on the merits and the risk of irreparable harm. *Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.,* 683 F.2d 704, 708 (2d Cir.1982), *C–Cure Chemical Co., Inc. v. Secure Adhesives Corp.,* 571 F.Supp. 808, 814 (W.D.N.Y.1983).

The threshold determination that must be made in a trademark infringement case is whether the mark in question is eligible

for protection. *Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 215 (2d Cir.1985). A mark can fall into one of four general categories, which, in order of ascending strength, are (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1130 (2d Cir. 1979); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). The Second Circuit recently set forth the relationship between a marks classification and its eligibility for protection:

> Generic terms—"the common descriptive name of an article or substance"—are ineligible for any trademark protection. Descriptive marks, those "describ[ing] the qualities, ingredients, effects or other features of the product naturally and in ordinary language" are protectible only where secondary meaning can be established. Suggestive terms require "imagination, thought and perception to reach a conclusion as to the nature of goods," and are eligible for protection without proof of secondary meaning. Finally, arbitrary or fanciful marks "enjoy all the rights accorded to suggestive terms as marks—without the need of debating whether the term is 'merely descriptive' and with ease of establishing infringement."

*Thompson Medical Co., Inc. v. Pfizer, Inc., supra,* 753 F.2d at 212–213 (citations omitted).

■ Applying the above analysis to the marks at issue in the present case, I conclude that the marks VISION and THE VISION LETTER are eligible for trademark protection. It is evident at the outset that the word "VISION" is not synonymous with a magazine or newsletter and is thus not used in its generic sense by either party. Nor is it a descriptive term, since it does not "convey ... an immediate idea of the ingredients, qualities, or characteristics of the goods," *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 295 F.Supp. 479, 488 (S.D.N.Y.1968). Since a consumer using "imagination, thought and perception" is unlikely to conclude that the publications involve Latin American issues, the marks as used by Vision Inc. best qualify as arbitrary, which refers to common words applied in an unfamiliar way. *See Abercrombie & Fitch Co. v. Hunting World, Inc., supra,* 537 F.2d at 11 n. 12. As such, the marks are entitled to trademark protection.

■ Once a mark is determined to be protectible, the next and central area of inquiry must be the degree to which any likelihood of confusion exists. *Thompson Medical Co., Inc. v. Pfizer, Inc., supra,* 753 F.2d at 211. In *Polaroid Corp. v. Polarad Elects. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961), the Second Circuit noted the factors that must be examined in making such a determination:

> [The] strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 495. An assessment must also take into account "the equities involved." *See Information Clearing House v. Find Magazine,* 492 F.Supp. 147, 155 (S.D.N.Y.1980). No single factor is determinative. Instead, all the factors must be considered together according to the degree to which each is implicated. *Lambda Electronics v. Lambda Tech. Inc.,* 515 F.Supp. 915, 925 (S.D.N.Y.1981).

## 1. Strength and Similarity of the Mark

■ The Second Circuit has held that:
> [t[he term "strength," as applied to trademarks, refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as enamating from a particular, although possibly anonymous, source.

*McGregor-Doniger Inc. v. Drizzle, Inc., supra,* 599 F.2d at 1131. Arbitrary marks and registered marks are by their very nature distinctive and strong trademarks, although a mark consisting of a common

word is less strong than a fanciful mark. *See Proctor & Gamble Co. v. Johnson & Johnson, Inc.*, 485 F.Supp. 1185, 1197 (S.D. N.Y.1979), *aff'd*, 636 F.2d 1203 (2d Cir. 1980). However, this strength may be diminished by the existence of similar marks used in connection with similar products. *See Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F.Supp. 915, 925. Parks has submitted evidence of numerous other registered trademarks, both subsisting and expired, using the word "VISION" in some manner, including several instances in which "VISION" was a part of the publications title—Twin Vision, TV Vision, Vision Mound, Cable Vision, and Peripheral Visions. Parks Affidavit, Ex. A.

### 2. Similarity of Marks

Although the close similarity between the marks used by the parties is evident, there are distinguishing factors. On the Spanish-language magazine, VISION is pronounced in Spanish with three syllables and the accent on the third syllable. On certain magazine covers, and in business correspondence, an accent is placed over the word. The additional letters U.S.A. in Park's mark, although small, serves to distinguish the marks in overall appearance. VISION appears in the upper left of the magazine on a dark background, THE VISION LETTER appears in square block letter across the very top, while VISION USA appears with a somewhat three dimensional aspect in thinner typeface across the top of the magazine.

In addition, the superficial visual similarity of the marks VISION, THE VISION LETTER, and VISION USA is not dispositive of the issue of likelihood of confusion. "Similarity in and of itself is not the acid test. Whether the similarity is likely to provoke confusion is the crucial question." *McGregor-Donizer, Inc. v. Drizzle, Inc.*, *supra*, 599 F.2d at 1133, *quoting* R. Callman, "The Law of Unfair Competition, Trademarks and Monopolies", § 82.1(2) (1969) at 601–02 (footnote omitted); *see also C–Cure Chem. Co. v. Secure Adhesives Corp.*, 571 F.Supp. 808, 815 (W.D.N.Y.1983). In making this analysis,

the overall impression of the products on the consumer must be considered. *C-Cure Chem. Co. v. Secure Adhesives Corp.*, *supra*, 571 F.Supp. at 815. In this case the overall impression which the allegedly infringing product makes upon the consumer or advertising client is not such "that he is likely to believe the product is from the same source as the one he knows under the trademark." *McGregor-Donizer, Inc. v. Drizzle, Inc.*, *supra*, 599 F.2d at 1134. In addition to the visual differences in the manner in which the word "VISION" is displayed, the fact that VISION USA is an English-language magazine is immediately apparent. VISION USA and THE VISION LETTER are sufficiently different in presentation and appearance as to render them dissimilar despite the use of the same word.

### 3. Proximity of the Products

The differences between the products in issue are substantial and readily apparent. The VISION mark is used in connection with a Spanish language magazine directed to articles on Latin America, and THE VISION LETTER mark is used in connection with a newsletter dealing with Latin American economic issues. VISION USA is directed to an entirely different group of consumers. More important, it is distributed to the public as an insert in Sunday newspapers, not sold at newstands. It is read for pleasure, not business and covers a very different set of issues. Because the topics covered the methods of distribution, and apparent readership are different, the products are not proximate, despite the fact that both are magazines published in New York.

### 4. Bridging the Gap

There is no evidence that Vision Inc. is likely to bridge the gap between the publications at issue. Vision Inc. has been using its marks in relation to Latin American issues for many years. It appears unlikely that it will expand its use to include an English language newspaper insert. For that reason, it seems unlikely that many of Vision Inc.'s readers would believe that it

had expanded its operation to include the VISION USA newspaper insert.

### 5. Actual Confusion

A plaintiff usually faces a formidable task in obtaining proof of actual confusion, especially where only a single issue of the allegedly infringing product has been distributed. *Information Clearing House v. Find Magazine*, 492 F.Supp. 147, 159 (S.D.N.Y.1980). In this case Vision Inc.'s efforts do not provide convincing evidence of actual confusion as to the source or origin. Vision Inc. presented evidence of an instance in which an individual allegedly received the telephone number of VISION USA in response to a request to directory assistance for the telephone number of Vision Inc. According to Vision Inc., this confusion is merely symptomatic of the possibilities for confusion that might result. However, while the individual who received the wrong information may have been confused as to the number, he was not confused as to the source or origin of the various publications. There is no evidence that the introduction of Vision Inc. caused any individual consumer or advertiser to be confused as to the origin of the newspaper insert.

### 6. Defendant's Good Faith

Despite Vision Inc.'s claims that the adoption of VISION USA as a mark after hearing of the existence of Vision Inc.'s marks is evidence of bad faith, "[k]nowledge of the existence of plaintiff's trademark does not establish that defendants acted in bad faith." *Information Clearing House v. Find Magazine, supra,* 492 F.Supp. at 161. It is not contended that the mark VISION USA was chosen as a result of Vision Inc.'s success or that Parks has sought to trade on Vision Inc.'s success. Parks has presented a credible explanation of her reasons for choosing the mark, an explanation consistent with the possible suggestive relationship between the name and the subject of the publication. There is no evidence that Park's decision was made in bad faith.

### 7. Quality of the Defendants' Product

As Vision Inc. notes, the quality of Park's publication is unknown since it has only just begun to be published. Although it asserts that the quality must be in doubt because on two occasions VISION USA did not answer its telephone during business hours, this is not convincing evidence of poor quality that might impinge on Vision Inc.'s reputation. The mere fact that Vision Inc. will have no control over the quality is not in itself sufficient to show that the infringing product is of a quality that might affect Vision Inc.'s business.

### 8. Sophistication of the Buyers

The sophistication of purchasers of VISION USA is difficult to assess. Since VISION USA is inserted free of charge into newspapers, there is no specific body of ordinary consumers as such. The general reading public for VISION USA must be considered unsophisticated since it potentially includes a complete cross-section of individuals. However, because individuals will not be purchasing VISION USA it is difficult to see how any lack of sophistication might cause confusion between the products that would lead someone to purchase the wrong product. The only danger that might exist would be if Vision Inc.'s readers, whose level of sophistication is unknown, were incapable of discerning the distinction between the products and thus might assume that the products came from the same source.

The focus of Vision Inc.'s concern is on its advertisers, who might be confused by the existence of a similarly named publication in the same city as Vision Inc. However, as the court noted in *McGregor-Doniizer, Inc. v. Drizzle, Inc., supra,* 599 F.d at 1137, "the greater the value of an article the more careful the typical consumer can be expected to be." An advertising executive purchasing advertising space is not an impulse buyer and is unlikely to be confused as to the publication in which he is placing an ad. The sophistication of VISION USA's actual "buying public", therefore, suggests that actual confusion would be unlikely.

### 9. Balancing the Equities

Although Vision Inc. argues that Parks will suffer little harm from the grant of an injunction against use of a name which it has just begun to use, VISION USA has been in existence for over a year and has apparently made considerable efforts with regard to its next issue. Furthermore, the fact that Vision Inc. waited four months after the initial publication of VISION USA to commence this suit also balances the equities against it.

An evaluation of the above factors leads to the conclusion that Vision Inc. has failed to meet its burden of proving likelihood of confusion. Although Vision Inc.'s marks are strong and there is close similarity between the relevant marks, the products themselves are dissimilar in content, approach, and method of distribution. There is no evidence of actual confusion as to source. Because of the manner in which VISION USA is distributed, consumers would not accidentally purchase the wrong magazine, nor is it likely that an advertiser would make a similar mistake. Although there is potential overlap between readers, a prior reader of VISION or THE VISION LETTER confronted with a copy of VISION USA is not likely to assume that it originated from the same source because of the dissimilarities between the publications. Vision Inc.'s most legitimate concern is that the existence of another publication in the same city with a similar name might prove to be confusing in the sense that it could be an annoyance in terms of such administrative matters as mail and telephone calls, but absent any evidence of a likelihood of confusion between the actual products this concern is not enough to justify the grant of a preliminary injunction.

The failure to establish any likelihood of confusion defeats Vision Inc.'s claim of probable success on the merits as to the trademark and trade name infringement claim, the Lanham Act claim and the common law claim of unfair competition. As to its claims for injury to business reputation, dilution, and deceptive practice under N.Y. Gen.B.Law §§ 349 and 349, which do not require a showing of likelihood of confusion, Vision Inc. has similarly failed to present enough evidence to meet its burden of establishing the probability of success on the merits or sufficiently serious questions going to the merits. It has failed to show any concrete evidence of bad faith or intentional trading on its reputation by Parks, nor has it demonstrated that its mark will be diluted, given the dissimilarities in market. *See Information Clearing House v. Find Magazine, supra,* 492 F.Supp. at 162 n. 44. In any event, given the lack of proof as to the likelihood of confusion or injury to Vision Inc.'s reputation, Vision Inc. has failed to demonstrate irreparable harm. *See Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42 (2d Cir.1983). Vision Inc. has, therefore, failed to make the showing necessary for the grant of a preliminary injunction.

For the reasons discussed above, Vision Inc.'s motion for a preliminary injunction is denied. Discovery will be completed by September 11, 1985 and a joint pretrial order submitted by September 18, 1985.

IT IS SO ORDERED.